1
2
3
4
5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8    MEDARDO LOPEZ and MARGARITA              No. C-13-2811 EMC
     LOPEZ, as parents of decedent MILANCA
9    LOPEZ, and as representatives of XAVIER
     C., deceased,                            **ORDER GRANTING DEFENDANTS'**
10                                            **MOTION FOR JUDGMENT ON THE**
                     Plaintiffs,              **PLEADINGS**
11
            v.                                **(Docket No. 27)**
12
     THE REGENTS OF THE UNIVERSITY OF
13   CALIFORNIA, *et al.*,

14                   Defendants.
     _____/
15

16

17                          I.    **INTRODUCTION**

18          This case arises out of the death of Milanca Lopez – an undergraduate at the University of

19   California, Berkeley – and her six year old son, Xavier.  On May 18, 2012, Milanca, Xavier, and

20   Defendant Jose Lumbreras – Milanca's boyfriend – were involved in a car accident.  Lumbreras was

21   driving the vehicle while under the influence of narcotics and/or alcohol.  Tragically, Milanca and

22   Xavier did not survive the accident.  Milanca's parents, Medardo Lopez and Margarita Lopez

23   ("Plaintiffs"), have instituted the instant action against Lumbreras, the Regents of the University of

24   California ("the U.C. Regents"), and Cephas John, the Leasing & Assignment Manager in the

25   Residential and Student Services Program at U.C. Berkeley.  In general, Plaintiffs allege that the

26   U.C. Regents and Mr. John were aware of, and failed to properly respond to, Lumbreras' continual

27   abuse and harassment of Milanca.  They allege that this failure was a proximate cause of Milanca

28   and Xavier's death.

**United States District Court**
For the Northern District of California

1  Before this Court are the motion for judgment on the pleadings brought by the U.C. Regents

2  and Mr. John as well as Plaintiffs' request for judicial notice.  For the following reasons,

3  Defendants' motion will be **GRANTED** as to Plaintiffs' federal causes of action.  However,

4  Plaintiffs will be granted leave to amend.

5  ## II.   FACTUAL AND PROCEDURAL BACKGROUND

6  Milanca Lopez was a Mexican-American woman who attended the University of California,

7  Berkeley from July 2007 to May 18, 2012.  Dkt. No.1, First Amended Complaint ("FAC") ¶ 5, 15.

8  During the fall semester of 2011, Defendant Lumbreras – a graduate student and student teacher at

9  U.C. Berkeley – and Milanca began a relationship.  *Id.* ¶ 16.  Plaintiffs allege, on information belief,

10  that Lumbreras used his position as a student teacher to initiate this relationship, but they do not

11  allege what facts underlie this belief.  *Id.*  Additionally, Plaintiffs have not alleged any facts

12  suggesting that Defendant Lumbreras was Milanca's teacher .

13  Soon after the relationship began, Lumbreras allegedly began to systematically control,

14  abuse, and insult Milanca.  He would publicly insult her in front of other undergraduate and graduate

15  students, referring to her as a "dirty whore," a "slut," and would denigrate her heritage by referring

16  to her as "not Mexican enough."  *Id.* ¶ 17.  In January 2012, Lumbreras invited Milanca to his home

17  to smoke marijuana with other students.  *Id.* ¶ 18.  During this visit, Lumbreras forced Milanca's 6

18  year old son, Xavier, to watch Lumbreras have sex with Milanca while Milanca attempted to make

19  Lumbreras stop.  *Id.*

20  Starting in March 2012, Lumbreras and Milanca began living together in Milanca's

21  apartment in the University Village – a housing complex located on the campus of U.C. Berkeley

22  and maintained under the direction and authority of the university.  *Id.* ¶ 9, 19.

23  On April 26, 2012, Milanca contacted a fellow U.C. Berkeley student, upset and crying

24  because Lumbreras was at a bar on campus drinking and refused to pick up Xavier from school.  *Id.*

25  ¶ 20.  Hours later, at 1:30 a.m. on April 27, 2012, Milanca contacted the same student while crying,

26  telling that student that Lumbreras was "punching and kicking" her in her apartment.  *Id.* ¶ 21.

27  Lumbreras then abruptly hung up the telephone.  *Id.* ¶ 22.  Within minutes, a group of U.C. Berkeley

28  students responded to Milanca's apartment to check on her welfare.  *Id.* ¶ 23-24.  They observed

United States District Court

For the Northern District of California

1  Milanca run out of her apartment, only half dressed, crying, screaming, and holding Xavier.  *Id.* ¶

2  24.  Milanca's arms and thighs displayed fresh bruises.  *Id.* ¶ 25.  Milanca and Xavier went to stay

3  with a neighbor for the night, but at 4:00 a.m., Lumbreras arrived at the apartment visibly

4  intoxicated and belligerent.  *Id.* ¶ 27.  He began to bang on the apartment door and yell insults at the

5  apartment for approximately 45 minutes.  *Id.*  When Milanca returned to the apartment the next

6  morning, she found that Lumbreras had broken and/or vandalized numerous items in her apartment,

7  including her laptop, television, and a jewelry box.  *Id.* ¶ 28.

8          Plaintiffs allege that in early May 2012, Milanca reported Lumbreras' abuse to U.C.

9  Berkeley personnel in two separate instances.  First, they allege that in early May 2012, "University

10 of California Berkeley Police Department Officers responded to Milanca's apartment on two

11 separate occasions."  *Id.* ¶ 29.  Plaintiffs allege that the officers "failed to draft notes, reports, or

12 otherwise removed Defendant from the apartment for an investigation."  *Id.*  However, Plaintiffs do

13 not allege what prompted the officers to respond to Milanca's apartment on those occasions or what

14 Milanca reported to them.  Second, Plaintiffs allege that around this time, Milanca telephoned Mr.

15 John and told him about the above incidents of abuse and insults.  *Id.* ¶ 30.[1]  Apparently, Mr. John

16 tried to respond to Milanca, but heard nothing from Milanca in response.  Dkt. No. 29-3, at 8.  On

17 May 7, 2013, Milanca emailed Mr. John and apologized for "not getting back to [him]" and telling

18 him "I ended up working things out."  *Id.*[2]  It is unclear from the FAC or the email what Milanca

19 actually told Mr. John about the underlying incidents.  Plaintiffs allege that Mr. John was

20 "responsible for reporting and otherwise taking reasonable steps to prevent further acts of dating,

21 stalking, and domestic violence incidents at the University Village," but failed to prevent the

22 incidents of domestic violence.  *Id.* ¶¶ 33, 34.

23

24

25          [1] The FAC states that Milanca telephoned Mr. John on May 7, 2012.  At the hearing,
26 Plaintiffs' counsel indicated this date may be an error.

27          [2] While not attached to the Complaint, this Court will consider the May 7, 2012 email from
   Milanca to Mr. John as it is referenced and implicitly incorporated by reference into the Complaint.
28 *See Chimara v. Contra Costa County Gov't*, No. 12-cv-00201 JSC, 2013 WL 189980, *1 (N.D. Cal.
   May 7, 2013).

United States District Court

For the Northern District of California

On May 18, 2012, Lumbreras drove himself, Milanca, and Xavier in a 1999 Cadillac while he was under the influence of narcotics and/or alcohol. *Id.* ¶ 41. Lumbreras' blood alcohol content was .219. *Id.* In this impaired state, Lumbreras drove his vehicle into a tree, killing Milanca and severely injuring Xavier. *Id.* ¶ 42. Xavier succumbed to his injuries in the hospital a week later. *Id.*

Plaintiffs filed the instant action in California state court on May 10, 2013. Plaintiffs assert thirteen causes of action. Only two of these are federal causes of action – Count 1 alleges a violation of Title IX, 20 U.S.C. § 1681(a), and Count 12 alleges a violation of Title VI, 42 U.S.C. § 2000d, *et seq. Id.* ¶ 44-50; *Id.* ¶ 123-136.

Plaintiffs base their Title IX count on the basis that Lumbreras "harassed Milanca Lopez based upon her sex and Mexican-American race and ethnicity, such that she was denied benefits and precluded from participation in school programs." *Id.* ¶ 49.[3] Specifically, Plaintiffs allege that Milanca was "scheduled to receive the benefits associated with U.C. Berkeley university housing until approximately June 29, 2012" and was "accepted and set to enroll as a graduate student at the University of California Los Angeles." *Id.* ¶ 50. Thus, it appears that Plaintiffs are alleging that it is the accident (and Milanca's subsequent death) which caused the deprivation of housing benefits. *See id.* ¶ 54 ("Further, said acts were so severe as to damage the physical, mental, and emotional health of Milanca and her minor child, Xavier. Ultimately, the severity of the actions and inactions of each Defendant led to the death of Milanca Lopez and her minor child.").

Plaintiffs allege that Lumbreras' harassment of Milanca was pervasive in that it "permeated all aspects of Milanca's personal, academic, and familial life." *Id.* ¶ 55. Further, Plaintiffs allege that the harassment took place at "numerous locations throughout campus and in front [of] numerous U.C. students, in Milanca's home, [Lumbreras'] home, and at the home of Milanca's neighbor." *Id.* This fact, combined with Milanca's May 7, 2012 telephone call and email to Mr. John are alleged to have conveyed to Mr. John and the University actual knowledge of Lumbreras' harassment, intimidation, and abuse. *Id.* ¶ 57. Plaintiffs also allege that numerous students had actual knowledge of Lumbreras' acts of domestic violence, but failed to report them. *Id.* ¶ 58.

---

[3] Plaintiffs' Title VI claim largely mirrors the Title IX claim, but is focused on Lumbreras' harassment on the basis of Milanca's race rather than on her gender.

4

United States District Court

For the Northern District of California

1   Plaintiffs state law causes of action are for negligence per se, negligence, negligent

2   supervision, premises liability, intentional infliction of emotional distress, negligent infliction of

3   emotional distress, battery, assault, and gender violence in violation of Cal. Civ. Code § 52.4. The

4   U.C. Regents and Mr. John have filed a motion for judgment on the pleadings, seeking to have

5   Plaintiffs' Complaint dismissed in its entirety. Dkt. No. 27.

6   ### III.   DISCUSSION

7   A.   Legal Standard

8   Under Federal Rule of Civil Procedure 12(c), "[j]udgment on the pleadings is properly

9   granted when there is no issue of material fact in dispute, and the moving party is entitled to

10  judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "Rule 12(c) is

11  'functionally identical' to Rule 12(b)(6) and . . . 'the same standard of review' applies to motions

12  brought under either rule." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047,

13  1054 n.4 (9th Cir. 2011). Accordingly, in considering such a motion, a court must take all

14  allegations of material fact as true and construe them in the light most favorable to the nonmoving

15  party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid"

16  dismissal. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

17  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough

18  facts to state a claim to relief that is plausible on its face.'" *Id.*; *see also Lewis v. City & County of

19  San Francisco*, No. C 11-5273 PJH, 2012 WL 909801, at *1 (N.D. Cal. Mar. 2012) (stating that to

20  survive a Rule 12(c) motion, a plaintiff must allege "'enough facts to state a claim to relief that is

21  plausible on its face.'" (citation omitted)). "A claim has facial plausibility when the plaintiff pleads

22  factual content that allows the court to draw the reasonable inference that the defendant is liable for

23  the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v.

24  Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability

25  requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*,

26  556 U.S. at 678.

27  In the context of ruling on both a Rule 12(b)(6) and Rule 12(c), motion, the Court is

28  generally limited to the contents of the complaint. However, in addition, the Court may consider

"documents referenced extensively in the complaint, documents that form the basis of plaintiff's claims, and matters of judicial notice when determining whether the allegations of the complaint state a claim upon which relief can be granted." *Mendelsohn v. Intalco Aluminum Corp.*, No. C06-0190RSL, 2006 WL 1148559, at *1 (W.D. Wash. Apr. 21, 2006); *see also United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003).[4]

Where a court grants a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c), leave to amend should be freely given if it is possible that further factual allegations will cure any defect. *See Somers v. Apple, Inc.*, 729 F.3d 953, 960 (9th Cir. 2013) ("[A] district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factional allegations . . . .").

B.    <u>Plaintiff's Have Failed to State a Claim for a Violation of Title IX, But Will Be Granted Leave to Amend</u>

Defendants raise a number of challenges to Plaintiffs' Title IX claim.  First, they argue that Plaintiffs cannot, under California's survival statute (Cal. Code Civ. Proc. § 377.34), state a claim under Title IX to the extent they seek emotional damages (pain, suffering, and the like).  Dkt. No. 27, at 4.  Second, they argue that Plaintiffs lack standing to assert the Title IX claim. Third, they

---

[4] Plaintiffs have filed a request for judicial notice.  (Dkt. No. 30).  In this motion, Plaintiff seeks to have the court take judicial notice of a "Dear Colleague" letter from the U.S. Department of Education, a Department of Education "Handbook for Campus Safety and Security Reporting," and various webpages from the University of California website relating to the reporting of sexual harassment.  Plaintiffs request for judicial notice is **GRANTED** for purposes of this motion. *See, e.g., Jarvis v. JP Morgan Chase Bank, N.A.*, No. CV 10-4184-GHK, 2010 WL 2927276 (C.D. Cal. July 23, 2010) ("Judicial notice may be taken of documents available on government websites."); *see also United States v. Wagner*, 19 F. App'x 542, 543 n.1 (9th Cir. 2001) (taking judicial notice of an FDIC manual).  However, the legal conclusions Plaintiffs seek to infer from these documents are not subject to judicial notice and, for the reasons which follow, the documents do not aid Plaintiffs' case.

Plaintiffs have also submitted three declarations in support of their opposition.  These are not appropriate for consideration at the judgment on the pleadings stage. *See United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("[I]t would have been improper for the court to consider the declaration and exhibits attached to the government's opposition without converting the motion to dismiss into a motion for summary judgment . . . .").  Accordingly, the Court will not consider the declarations or the assertions contained therein in ruling on this motion, except to the extent they establish Plaintiffs' status as Milanca's successors in interest. *See* Cal. Code of Civ. Proc. § 377.32.  Plaintiffs will, of course, be free to include any facts contained in these declarations in their amended complaint.

United States District Court
For the Northern District of California

1   imply that as the underlying conduct constitutes "domestic violence," it does not constitute "sexual

2   harassment" for purposes of Title IX.  *Id.* at 8.  Fourth, they argue that there is not a sufficient basis

3   for concluding that Defendants "knew or should have known" about Lumbreras' harassing conduct.

4   *Id.*  Finally, they argue there is no causal link between their alleged failure to act under Title IX and

5   the automobile accident in which Milanca and Xavier died.  *Id.* at 9.

6       The Court rejects Defendants first three arguments.  However, Plaintiffs' Title IX claim

7   suffers from a number of defects.  Accordingly, the Court will dismiss this claim with leave to

8   amend.

9       1.    Plaintiffs Have Standing to Assert Milanca's Title IX Claims

10      Defendants argue that Defendants lack standing to bring a claim for violation of Title IX.

11  Defendants are correct that, in general, non-students such as parents do not have a *personal* claim

12  under Title IX.  *See R.L.R. v. Prague Public School Dist. I-103*, 838 F. Supp. 1526, 1530 (W.D.

13  Okla. 1993) ("Non-students have no claim under Title IX."); *see also Seiwert v. Spencer-Owen

14  Cmnty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) ("Because there are no educational

15  opportunities or activities that the parents are excluded from, they have no claim.").  However, as

16  Defendants acknowledge in their reply, parents *do* have standing to assert Title IX claims on behalf

17  of a student.  *See, e.g.*, *D.V. v. Pennsauken Sch. Dist.*, No. 12-7646 (JEI/JS), 2013 WL 4039022, at

18  *9 (D.N.J. Aug. 7, 2013) (parents do not have standing to assert personal claims under Title IX but

19  do have standing to assert claims on the student's behalf); *Dipippa v. Union Sch. Dist.*, 819 F. Supp.

20  2d 435, 446 (W.D. Pa. 2011) ("Generally speaking, parents of a student whose rights were violated

21  do not have standing to assert personal claims under Title IX, but do have standing to assert claims

22  on the student's behalf."); *Haines v. Metro. Gov. of Davidson County*, 32 F. Supp. 2d 991, 1000

23  (M.D. Tenn. 1998) ("However, it is well-established that a parent, as next of friend, has standing to

24  assert a claim under Title IX.").

25      Defendants nonetheless argue that Plaintiffs do not have standing to assert a Title IX claim

26  on behalf of Milanca because Milanca was not a minor.  Dkt. No. 27, at 6.  They cite a single case

27  for the proposition that parents may not assert a Title IX claim on behalf of an adult child – *Burrow

28  by and Through Burrow v. Postville Cmty Sch. Dist.*, 929 F. Supp. 1193 (N.D. Iowa 1996).  This

1    case is inapposite.  There, the Northern District of Iowa found that a student's parents did not have

2    standing under Title IX because, "since Lisa Burrow has attained a majority age, she may bring the

3    present action in her own right, making it unnecessary for her Parents to assert Lisa's Title IX claims

4    on her behalf."  *Id.* at 1199.  Accordingly, the student in *Burrow* was physically capable of asserting

5    her own Title IX claim.  *Burrow* did not address the question of whether parents have standing to

6    assert their adult child's Title IX claim when the adult student is killed, rendered incapacitated, or

7    otherwise unable to assert his or her own claims.  Accordingly, Defendants have cited no case

8    directly addressing the question presented, and this Court has found none.

9          It is perhaps not surprising that there is little case law on this point.  In most Title IX claims

10   either the student in question will be a minor, making it difficult for the student to personally assert

11   his or her own claim, or the student will be an adult enrolled in a college and thus able to do so.

12   While no court appears to have addressed the question of whether parents have standing to assert

13   Title IX claims on behalf of a deceased adult child, a number of courts have implicitly found that

14   parents have standing to assert a Title IX claim on behalf of a deceased *minor* child.  *See, e.g.*,

15   *Vidovic v. Mentor City School Dist.*, 921 F. Supp. 2d 775 (N.D. Ohio 2013) (addressing the merits of

16   a Title VI and Title IX claim brought by parents on behalf of their deceased son); *Estate of*

17   *Carmichael ex rel. Carmichael v. Galbraith*, No. 3:11-cv-0622-D, 2012 WL 4442413 (N.D. Tex.

18   Sept. 26, 2012) (addressing the merits of a Title IX claim brought by parents on behalf of their

19   deceased son).  Defendants have offered no support for their contention that parents of a deceased

20   adult child do not have standing to assert their child's Title IX claims.  *Cf. White v. City of*

21   *Philadelphia*, 118 F. Supp. 2d 564, 566 n.1 (E.D. Pa. 2000) (holding that mother had standing to

22   bring a § 1983 action on behalf of her deceased adult child).  The Court finds no reason to treat the

23   Title IX claims of a deceased minor child any different from the Title IX claims of a deceased adult

24   child.

25         As a result, and in the absence of any authority to the contrary, the Court concludes that

26   Plaintiffs have standing to assert Milanca's Title IX claim.

27

28

United States District Court
For the Northern District of California

2.      Plaintiffs May State a Claim Under Title IX for Emotional Damages

Defendants next argue that, assuming Plaintiffs have standing to assert Milanca's Title IX claim, they may not assert a claim for non-economic damages (such as pain and suffering). Defendants base this argument on the fact that under California's survivorship statute, Plaintiffs may only seek economic damages suffered by Milanca and Xavier and not "damages for pain, suffering, or disfigurement." Cal. Code of Civ. Proc. § 377.34. As to the two federal causes of action asserted in the Complaint – Title IX and Title VI – the Court disagrees.[5]

Defendants' argument on this point is built on a premise this Court rejects: that the California survival statute applies to Plaintiffs' Title IX and Title VI claims. Although Defendants do not expressly explain why they believe that California's survival statute applies in this case, they cite *Walsh v. Tehachapi Unified School Dist.*, 827 F. Supp. 2d 1107 (E.D. Cal. 2011), on this point. In that case, the district court addressed whether a minor student's Title IX and 42 U.S.C. § 1983 claims survived his death. The court recognized that § 1983 and Title IX did not, by their terms, address the survivability of claims or the available remedies. *Id.* at 1127. The court thus looked to 42 U.S.C. § 1988 and held that, as to the question of survivability of the § 1983 and Title IX claims, "courts must look to state law, to the extent that state law is not inconsistent with the Constitution and the laws of the United States." *Id.*

As a result, it is apparent that Defendants believe that California's survival statute applies in this case by operation of 42 U.S.C. § 1988(a). This provision provides:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights . . . shall be exercised and enforced in conformity with the laws of the United States . . . but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as

---

[5] The Court finds, and Defendants do not appear to contest, that emotional distress damages are generally recoverable under Title VI and Title IX. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1204 (11th Cir. 2007) ("When an entity accepts funding from the federal government, it does so in exchange for a promise not to discriminate against third-party users of its services. A foreseeable consequence of discrimination is emotional distress to the victim, and emotional damages have long been available for contract breach in the public accommodations context."); *Scarlett v. School of Ozarks, Inc.*, 780 F, Supp. 2d 924, 934 (W.D. Mo. 2011). All that is at issue is whether non-economic compensatory damages survive the death of the claimant.

1

United States District Court
For the Northern District of California

> modified and changed by the constitution and statutes of the State
> wherein the court having jurisdiction of such civil or criminal cause is
> held, so far as the same is not inconsistent with the Constitution and
> laws of the United States . . . .

42 U.S.C. § 1988(a).  Thus, this provision directs courts to "apply state law in certain types of cases where federal law is silent or inadequate."  *Hanson v. Atlantic Research Corp.*, No. 4:02CV00301 SMR, 2003 WL 430484, at *3 (E.D. Ark. Feb. 14, 2013).  Specifically, in certain civil rights cases, if federal law is silent on a given issue, district courts will apply state law to fill in that gap so long as it is not inconsistent with federal law or policy.  *See Hardin v. Straub*, 490 U.S. 536, 538 (1989) ("In enacting 42 U.S.C. § 1988 Congress determined that gaps in federal civil rights acts should be filled by state law, as long as that law is not inconsistent with federal law"); *see also id.* at 539 (applying a state rule where it "did not defeat either § 1983's chief goals of compensation and deterrence" or "subsidiary goals of uniformity and federalism").

As the district court in *Walsh* recognized, Title IX's provisions are silent as to survivor claims.  *Walsh*, 827 F. Supp. 2d at 1127.  Accordingly, there is a "gap" in Title IX on this point.  Thus, if 42 U.S.C. § 1988(a) applies to Title IX, Defendants are correct that California's survival statute would govern the survivability of the claim, to the extent it is not inconsistent with Title IX or another federal law.  Defendants are further correct that *Walsh* concluded that (1) California's survival statute governed the survivability of Title IX claims; (2) that California's survival statute was not inconsistent with the purposes of Title IX; and (3) that the California survival statute precluded recovery of emotional distress.  *Walsh*, 827 F. Supp. 2d at 1127.  However, this Court concludes that *Walsh* was incorrectly decided and that 42 U.S.C. § 1988(a) does not apply to Title IX (or any other federal statute not expressly listed in § 1988(a)).

By its express terms, § 1988(a) applies to "civil and criminal matters" brought under the "provisions of titles 13, 24, and 70 of the Revised Statutes."  42 U.S.C. § 1988(a).  The Revised Statutes were Congress' first official codification of federal law and was a precursor to the United States Code.  According to the textual references following the text of § 1988(a):

> Title 13 of the Revised Statutes, referred to in subsec. (a), was in the
> original "this Title" meaning title 13 of the Revised Statutes,

consisting of R.S. sections 530 to 1093.  For complete classification of R.S. sections 530 to 1093 to the Code, see Tables.

Title 24 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'CIVIL RIGHTS'" meaning title 24 of the Revised Statutes, consisting of R.S. sections 1977 to 1991, which are classified to sections 1981 to 1983, 1985 to 1987, and 1989 to 1994 of this title. For complete classification of R.S. sections 1977 to 1991 to the Code, see Tables.

Title 70 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'Crimes,'" meaning title 70 of the Revised Statutes, consisting of R.S. sections 5323 to 5550.  For complete classification of R.S. sections 5323 to 5550, see Tables.

42 U.S.C. § 1988(a) (References in Text).  Thus, Title 24 of the Revised Statutes generally apply to the Reconstruction Era civil rights acts, while Title 70 of the Revised Statutes refer to criminal statutes now codified in Title 18.  *See Kettner v. Compass Group USA, Inc.*, 570 F. Supp. 2d 1121, 1128 (D. Minn. 2008).[6]  Accordingly, a number of federal statutes which may be characterized as "civil rights" statutes nonetheless fall outside of § 1988(a)'s express terms – including Title IX and Title VI.

Courts have split as to whether § 1988(a) should nonetheless apply to modern civil rights statutes not expressly enumerated in § 1988(a).  For example, in *Fleming v. U.S. Postal Service AMF O'Hare*, 27 F.3d 259 (7th Cir. 1994), the Seventh Circuit expressly held that 42 U.S.C. §

---

[6] In general, Title 13 of the Revised Statutes "covered governance of the judiciary and the creation of jurisdiction."  Brian Owsley, *Survivorship Claims Under Employment Discrimination Statutes*, 69 Miss. L.J. 423, 428 n.20 (1999).  Specifically, according to the tables that accompany the United States Code, the provisions of Title 13 of the old Revised Statutes have either been repealed or placed into the following United States Code provisions (as amended):

- Title 1: Section 113;
- Title 18: Sections 3005, 3012; 3041, 3047, 3049, 3141-3144, 3282, 3283; 3290. 3432, 3486, 3497, 3565, 3569, 4084;
- Title 19: Sections 579, 580;
- Title 28: Sections 292, 501, 403, 506, 509, 541-543, 546, 547, 549, 544, 545, 550, 551, 553, 554, 564, 604, 636, 751, 755, 793, 952, 953, 1251, 1333, 1334, 1338, 1351, 1355, 1652, 1691, 1733, 1734-1739; 1740, 1742-1745, 1821, 1823, 1825, 1871,1873, 1874, 1912, 1914, 1918, 1920-1924, 1927-1929, 1961, 1962, 2003, 2006, 2007, 2041, 2042, 2071-2073, 2104-2106, 2241-2243, 2251, 2252, 2405-2408, 2413, 2462-2465, 2710-2718;
- Title 30: Section 53;
- Title 42: Section 1988;
- Title 44: Section 3703.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1988(a) did not apply to two modern civil rights statutes—Title VII and the Rehabilitation Act of

1973.  *See id.* at 262 ("At all events, the present case was not brought under 42 U.S.C. § 1983 . . .

but under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.  These

statutes are not affected by 42 U.S.C. § 1988(a) . . . .").  Numerous cases are in accord.  *See, e.g.*,

*Cardella v. CVS Caremark Corp.*, No. 3:08-CV-1656-M, 2010 WL 1141393, at *1 n.7 (N.D. Tex.

Mar. 25, 2010) ("In this Court's view [§ 1988(a)] does not apply to David Cardella's claims,

because none of his claims arise under the specifically enumerated laws listed therein.  Titles 13, 24,

and 70 of the Revised Statutes do not correspond to the statutes codifying the ADA, FMLA, or

ERISA."); *Makakestad v. Mayo Clinic Arizona*, No. CV-04-2183-PHX-DGC, 2006 WL 2307417, at

*1 (D. Ariz. Aug. 9, 2006) ("By its very language, § 1988(a) does not apply to Title VII.  Section

1988(a) makes explicit those titles to which it applies, and Title VII is not among them." (citation

omitted)); *Hanson*, 2003 WL 430484, at *3 ("The list of cases to which Section 1988(a), by its very

language, applies does not include ADA or Title VII cases. . . .  The court . . . holds that 42 U.S.C. §

1988(a) has no place in this survivability inquiry."); *Kullings v. Grinders for Industry, Inc.*, 115 F.

Supp. 2d 828, 845 (E.D. Mich. 2000) (declining to apply § 1988(a) because "ADEA lacks and

provision analogous to § 1988, which expressly invites the courts to look to state law where federal

law is 'deficient.'").

Conversely, a number of courts have found that § 1988(a) applies to federal civil rights

actions more generally, even when not expressly enumerated in § 1988(a).  *See, e.g.*, *Slade for

Estate of Slade v. U.S. Postal Serv.*, 952 F.2d 357, 360 (10th Cir. 1991) (finding that survivability of

an ADA claim was governed by state law under § 1988); *Nordwell v. PHC-LAS Cruces, Inc.*, — F.

Supp. 2d — , No. Civ 12-0429 JB/WPL, 2013 WL 4400382, at *29 n.23 (D.N.M. July 31, 2013)

(recognizing the split and that the majority of courts have applied § 1988(a) to civil rights cases

more generally); *see also Green ex rel. Estate of Green v. City of Welch*, 467 F. Supp. 2d 656 (S.D.

W.Va. 2006) ("The Court will therefore apply West Virginia law pursuant to § 1988(a) to determine

the survivability of plaintiff's ADA claim."); *Rosenblum v. Colorado Dep't of Health*, 878 F. Supp.

1404 (D. Colo. l994) ("The ADA does not address the issue of survival of causes of action.  Thus,

pursuant to 42 U.S.C. § 1988, the court must look to state law, provided that it is not inconsistent

United States District Court
For the Northern District of California

1    with the Constitution and laws of the United States."); *Glanz v. Vernick*, 750 F. Supp. 39, 42 (D.

2    Mass. 1990) (§1988(a) applied to Title VI (upon which Title IX is based) claims, stating that

3    "statutory construction of Title VI, like all other federal civil rights statutes, is governed by 42

4    U.S.C. § 1988").

5            Nonetheless, the Court finds the latter cases unpersuasive.  None of these cases support their

6    "conclusion with any persuasive analysis – or in fact any analysis at all – of the statutory language.

7    Rather, courts seem to have ignored the actual language of Section 1988(a), presumably under the

8    unsupported assumption that it applies broadly to any and all actions that could be characterized as

9    sounding in 'civil rights.'" *Kettner*, 570 F. Supp. 2d at 1131-32 (footnote omitted).  For instance,

10   the Tenth Circuit's decision in *Slade*, which held the survivability of a Title VI claim was governed

11   by state law, relied on the Seventh Circuit's decision in *Bennett v. Tucker*, 827 F.2d 63 (7th Cir.

12   1987).  *Bennett* involved a § 1983 claim – a statute referenced in § 1988(a).  Nonetheless, despite the

13   obvious applicability of § 1988(a) to § 1983, the *Bennett* Court spoke more broadly (and apparently

14   imprecisely) by stating that § 1988(a) "provides that if federal law does not provide a rule of

15   decision *in a civil rights case*, federal law will incorporate the appropriate state law."  *See id.* at 67

16   (emphasis added).  Neither the Tenth Circuit in *Slade* nor the Seventh Circuit in *Bennett* provided

17   any basis in the text or legislative history of § 1988(a) to justify their reading of that statute.

18           It is a fundamental canon of statutory construction that where the "statutory text is plain and

19   unambiguous," a court "must apply the statute according to its terms."  *Carcieri v. Salazar*, 555 U.S.

20   379, 387 (2009).  Further, the "doctrine of *expressio unius est exclusio alterius* 'as applied to

21   statutory interpretation creates a presumption that when a statute designates certain persons, things,

22   or manners of operation, all omissions should be understood as exclusions.'" *Silvers v. Sony Pictures

23   Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (citation omitted).  Section 1988 is clear –

24   it applies to *specific* claims brought under *specific* provisions – provisions that do not include the

25   more modern civil rights actions of the twentieth century.  Rather, as thoroughly examined by Judge

26   Susan Nelson in her well reasoned opinion in *Kettner v. Compass Group USA, Inc.*, 570 F. Supp. 2d

27   1121 (D. Minn. 2008), the text of § 1988(a) has "always been confined to certain core civil rights

28   provisions – essentially the Reconstruction Era Civil Rights Acts" and has never been extended by

13

1    Congress to cover other, more recent acts, which may plausibly be labeled "civil rights" legislation.

2    *Id.* at 1128.  The Court agrees with Judge Nelson's analysis.

3         Further, the Court concludes that the omission of the more recent civil rights statutes from §

4    1988(a)'s text cannot be dismissed as "legislative oversight in failing to update Section 1988."  *Id.* at

5    1130.  Congress has twice amended Section 1988 to add attorneys' fees provisions codified at §

6    1988(b) and § 1988(c).  *Id.* at 1131.  Both of these provisions, like § 1988(a), expressly limit their

7    application to certain statutory provisions (including the more recent civil rights statutes).  *See* 42

8    U.S.C. § 1988(b), (c).  Further, Congress has continually, by subsequent amendment, expanded the

9    scope of subsections (b) and (c) to encompass new legislation.  *Kettner*, 570 F. Supp. 2d at 1131.

10   Yet, "in none of those enactments nor in any other modification of Section 1988, did Congress

11   expand the scope of Section 1988(a) beyond its currently-stated limited applicability."  *Id.*

12        Finally, even if § 1988(a) did apply to Title IX, the Court would still conclude that

13   California's survival statute does not apply to Title IX (or Title VI).  The Court has been unable to

14   locate any statement in the legislative history of Title VI or Title IX that would shed light on

15   Congress' intent regarding the survivability of these claims or their interplay with § 1988(a).  It is

16   beyond dispute, however, that where a civil rights statute – including Title VI or Title IX – is

17   ambiguous, courts must "broadly interpret" those statutes so as to "effectuate the remedial purpose

18   of the legislation."  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 816 (9th Cir. 2002); *see also United*

19   *States v. El Camino Community College Dist.*, 454 F. Supp. 825, 829 (C.D. Cal. 1978) ("In order to

20   effectuate the remedial purpose of Title VI, the statute should be liberally construed.").  The Court

21   finds that applying California's survival statute, which would absolve defendants of liability for

22   emotional distress, pain and suffering, and other non-economic damages, would be inconsistent with

23   Title VI and Title IX's broad remedial purpose.  *Cf. Williams v. City of Oakland*, 915 F. Supp. 1074

24   (N.D. Cal. 1996) (finding that, notwithstanding § 1988(a), California's survival statute did not apply

25   in a § 1983 action because it was "inconsistent with the purposes of section 1983" as it "cuts off *all*

26   recovery for pain and suffering" and thus has "a substantial effect on the type and amount of

27   damages that are recoverable . . . where the victim dies before judgment is entered").

28

United States District Court

For the Northern District of California

Accordingly, the Court concludes that federal common law, not California law of survivorship, governs the question of whether, and to what extent, Milanca's Title VI and Title IX claims survived her death.  Under federal common law, a cause of action survives a decedent's death "unless it is an action for penalties."  *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 876 (11th Cir. 1986); *see also E.E.O.C. v. Timeless Invests., Inc.*, 734 F. Supp. 2d 1035 (E.D. Cal. 2010) ("Under federal common law, claims that are remedial in nature survive the claimant's death, while claims that are penal in nature do not survive."); *Hanson*, 2003 WL 430484, at *4 ("[T]he general federal common law rule[] is that claims that are not penal in nature survive the death of the aggrieved party while those that are penal in nature do not.").  Claims for non-economic compensatory damages in the form of pain and suffering, emotional distress, and the like, are not punitive and therefore survived Milanca's death.  *Cf. Maakestad v. Mayo Clinic Arizona*, No. CV-04-2183-PHX-DGC, 2006 WL 2307417, at *1 (D. Ariz. Aug. 9, 2006) (holding that claims for pain and suffering survived the claimant's death); *Ambruster v. Monument 3: Realty Fund VIII Ltd.*, 963 F. Supp. 862, 866 (N.D. Cal. 1997) ("Although no federal cases examine the issue of survival of emotional distress damages under the [Fair Housing Act] in particular, in other types of civil rights cases, the courts have almost always allowed emotional distress damages to survive the death of the plaintiff.").[7]

3. <u>Plaintiffs Have Failed to State a Claim Under Title IX, but Will be Given Leave to Amend</u>

As an initial matter, the Court notes that Plaintiffs cannot state a Title IX claim against Mr. John – an individual.  Rather, Plaintiffs can only state a Title IX claim against the U.C. Regents.  *See Doe by and Through Doe v. Petaluma City School Dist.*, 830 F. Supp. 1560, 1576-77 (N.D. Cal. 1993) ("Courts that have addressed the question have held that only institutions may be liable under Title IX, not individuals.  The court agrees that individuals may not be held personally liable under Title IX." (citation omitted)); *see also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir.

---

[7] The Court notes that the opposite result obtains as to Plaintiffs' state law causes of action. Survivability of state law claims is governed by state law.  *See, e.g.*, *In re C.R. Stone Concrete Contractors, Inc.*, 462 B.R. 6, 20 (Bankr. D. Mass. 2011); *Estate of Began v. Lake County, Colo. Sheriff's Office*, No. 07-cv-01786, at *5 (D. Colo. July 3, 2008).  Accordingly, California's survival statute would apply to these claims.

United States District Court

For the Northern District of California

1   2002) ("Since this private right of action extends only to claims against the educational institution

2   itself, the plaintiffs' Title IX claim perforce fails as to all the individual defendants." (citation

3   omitted)).  Accordingly, the Court **DISMISSES** Plaintiffs' Title IX claim against Mr. John with

4   prejudice.

5          The Court next examines Plaintiffs' Title IX claim against the U.C. Regents.  Title IX

6   provides, in relevant part:

7                  No person in the United States shall, on the basis of sex, be excluded
                   from participation in, be denied the benefits of, or subjected to
8                  discrimination under any education program or activity receiving
                   Federal financial assistance.

9

10  20 U.S.C. § 1681(a).  Title IX prohibits intentional discrimination.  *See Alexander v. Sandoval*, 532

11  U.S. 275, 280 (2001) (holding that Title VI, upon which Title IX is based, prohibits only intentional

12  discrimination).  A school's failure to respond to student-to-student sexual harassment can constitute

13  intentional discrimination for purposes of Title IX in certain "limited circumstances."  *See Davis*

14  *Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643 (1999).

15         To state a prima facie case under Title IX based on student-to-student sexual harassment,

16  Plaintiffs must show: (1) The sexual harassment was so severe, pervasive, and objectively offensive

17  that it could be said to deprive the plaintiff of access to the educational opportunities or benefits; (2)

18  the U.C. Regents had actual knowledge of the sexual harassment; and (3) the U.C. Regents were

19  deliberately indifferent to the harassment.  *See Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736,

20  739 (9th Cir. 2000); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012).  Further,

21  because Plaintiffs allege that the U.C. Regents were deliberately indifferent to an incident of sexual

22  harassment or violence after receiving notice of it, they must also allege facts showing that the U.C.

23  Regent's deliberate indifference caused Milanca to be subject to further harassment and deprivation

24  of rights.  *See Williams v. Bd. of Regents of Univ. System of Ga.*, 477 F.3d 1282, 1296 (11th Cir.

25  2007) ("[W]e hold that a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX

26  recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further

27  discrimination).

28

United States District Court

For the Northern District of California

1      Finally, a federal funding recipient may only be held liable under Title IX where the

2    recipient "exercises substantial control over both the harasser and the context in which the known

3    harassment occurs." *Davis*, 526 U.S. at 645; *see also Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773,

4    782 (8th Cir. 2001) ("Specifically, the school district's deliberate indifference must either directly

5    cause the abuse to occur or make students vulnerable to such abuse, and that abuse 'must take place

6    in a context subject to the school district's control.'").

7                a.    <u>Housing Benefits Constitute an "Educational Benefit" Under Title IX, But</u>

8                       <u>Plaintiffs Have Failed to Adequately Allege this Benefit Was Denied as a</u>

9                       <u>Result of a Title IX Violation</u>

10      Title IX has a causative element – Title IX plaintiffs asserting a sexual harassment theory

11    must demonstrate that the harassment was so severe, pervasive, and objectively offensive that it

12    caused a deprivation of educational opportunities or benefits. *See Porto v. Town of Tewksbury*, 488

13    F.3d 67, 72 (1st Cir. 2007) (recognizing that a plaintiff must show that "the harassment caused the

14    plaintiff to be deprived of educational opportunities or benefits"). In this case, Plaintiffs appear to

15    allege that the Milanca was deprived of an "educational benefit" because the fatal car accident

16    resulted in her being unable to enjoy the benefits of living at University Village. For example, in

17    their opposition to the motion to dismiss, Plaintiffs assert that Milanca suffered "the loss of

18    educational benefit . . . in that, she and Xavier were not able to complete living at her University

19    village apartment throughout May and the end of June." Pls.' Opp. at 11. Further, in their

20    Complaint, Plaintiffs allege that:

21              Further, Milanca Lopez was scheduled to receive the benefits

                 associated with U.C. Berkeley university housing until approximately

22              June 29, 2012. Milanca was scheduled to pay for these benefits with

                 federal and state student aid receive[d] through and paid to U.C.

23              Berkeley. On June 29, 2012, Milanca was accepted and set to enroll

                 as a graduate student at the University of California Los Angeles.

24

25    FAC ¶ 50.

26      Defendants argue that "educational benefit" cannot be extended to include "housing

27    arrangements." Dkt. No. 32, at 8. The Court disagrees. First, the federal regulations adopted in

28    furtherance of Title IX apply broadly to "any academic, extracurricular, research, occupational

United States District Court

For the Northern District of California

1  training, or other education program or activity." 45 C.F.R. § 86.31.  In fact, there is a regulation,

2  promulgated under the authority of Title IX, which expressly prohibits a recipient of federal funds

3  from "apply[ing] different rules or regulations, impose different fees or requirements, or offer

4  different services or benefits related to housing" on the basis of sex.  *Id.* § 86.32.  As a result, Title

5  IX has clearly been construed by the relevant federal agencies as extending to the housing "benefits"

6  supplied by a federal funds recipient.

7      Accordingly, the question is whether Plaintiffs have alleged sufficient facts showing that

8  Milanca was deprived of the benefits of University housing because of an act of sexual harassment.

9  The Court concludes they have not.  Rather, Plaintiffs have alleged that it was the *fatal accident* that

10  caused Milanca to be deprived of the benefits of University housing.  There are no allegations from

11  which it can be concluded that Lumbreras' decision to drive intoxicated was an act of harassment or

12  abuse motivated by Milanca's sex.  Further, the fatal accident is far too attenuated from the other

13  allegations contained in the Complaint.  Accordingly, even if the Court were to conclude that

14  Lumbreras' pre-accident acts were actionable under Title IX as currently alleged,[8] Plaintiffs have

15  failed to allege facts showing that *these* acts deprived Milanca of University housing benefits (or any

16  other educational benefit) which resulted from the fatal car accident.

17      b.  Plaintiff's Have Failed to Allege Facts Showing that the U.C. Regents Had

18          Actual Notice of, or Were Deliberately Indifferent to, Sexual Harassment

19      Plaintiffs' Title IX claim is deficient for another reason.  Plaintiffs' Complaint inadequately

20  alleges that the U.C. Regents had actual notice of sexual harassment.  Where a Title IX claim is

21  predicated on a student's sexual harassment, actual notice on the part of the federal funding recipient

22  is critical because "it is the deliberate failure to curtail known harassment, rather than the harassment

23  itself, that constitutes the intentional Title IX violation."  *Mansourian v. Regents of University of*

24  *California*, 602 F.3d 957, 967 (9th Cir. 2010).  The actual notice requirement under Title IX is

25  satisfied where an "appropriate official possessed enough knowledge of the harassment that it

---

27/28  [8] And, as discussed below, the Court does not, either because there are no facts alleged suggesting it was motivated by Milanca's sex (as to the April 2012 domestic violence incident) or there are no facts alleged that the U.C. Regents had actual notice or were deliberately indifferent to such acts (as to the abusive name-calling and sexual misconduct alleged).

United States District Court

For the Northern District of California

1    reasonably could have responded with remedial measures to address the kind of harassment upon

2    which plaintiff's legal claim is based." *Folkes v. N.Y. College of Osteopathic Medicine*, 214 F.

3    Supp. 2d 273, 285 (E.D.N.Y. 2002) (citation omitted).  Further, deliberate indifference occurs "'only

4    where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of

5    the known circumstances.'" *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000)

6    (quoting *Davis*, 526 U.S. at 648).  This is an "exacting standard."  *Doe v. Sch. Bd. of Broward*

7    *County, Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010).

8         Plaintiffs' Complaint relies on three facts in support of the contention that the U.C. Regents

9    had actual notice of the alleged sexual harassment and were deliberately indifferent: (1) Numerous

10   U.C. Berkeley students observed the alleged harassment but failed to report it (Compl. ¶ 58); (2)

11   U.C. Berkeley police officers responded to Milanca's apartment in two instances but took no action

12   (*Id.* ¶ 29); and (3) Milanca called and emailed Mr. John about the April 27 incident and he took no

13   action (*Id.* ¶ 30).  None of these allegations adequately allege actual notice or deliberate indifference

14   on the part of the U.C. Regents.

15        That Milanca's peers witnessed or were aware of alleged incidents of sexual harassment is

16   insufficient to impute actual notice to the U.C. Regents.  Rather, Title IX requires that "'an official

17   who at minimum has authority to address the alleged discrimination and to institute corrective

18   measures on the recipient's behalf [have] actual knowledge of discrimination in the recipient's

19   programs.'"  *Oden v. N. Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Gebser v.*

20   *Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)); *see also Annamaria M v. Napa Valley*

21   *Unified Sch. Dist.*, No. C 03-0101 VRW, 2006 WL 1525733, at *2 (N.D.Cal. May 30, 2006).  The

22   Complaint does not allege the student informed University officials of the incidents.  In fact,

23   Plaintiffs allegations that students who knew of Lumbreras' conduct failed to report it, militates

24   *against* a finding that the U.C. Regents had actual knowledge of that conduct.

25        Further, Plaintiffs' allegations that the U.C. Berkeley police and Mr. John had actual notice

26   of sexual harassment are insufficiently alleged.[9]  As to the U.C. Berkeley police,  Plaintiffs'

27   ―――――――――――――――――

28        [9] The U.C. Regents have not argued that either the U.C. Berkeley police officers or Mr. John
     lacked the authority to take corrective action.

United States District Court

For the Northern District of California

Complaint is wholly silent as to why the campus police officers responded to Milanca's apartment, what they encountered, and what Milanca told them. Accordingly, it is impossible to tell whether they had actual notice of *sexual* harassment or abuse for purposes of Title IX. Similarly, while Plaintiffs allege that Milanca telephoned Mr. John and sent him an email "concerning" the April 26-27, 2013 incident, there is no indication of what he was told. Compl. ¶ 30, 57. Further, after Mr. John attempted to get in touch with Milanca regarding her phone calls, Milanca replied by apologizing for not getting back to him and stating that she "ended up working things out." Dkt. No. 29-3, at 8. Accordingly, Plaintiffs have plead no facts which explain the nature or scope of information the U.C. Regents possessed. Nor does the Complaint allege the U.C. Regents had sufficient knowledge such that Defendants' inaction constituted deliberate indifference to a known violation of Title IX. Plaintiffs' Complaint is thus deficient. *See, e.g.*, *Liu*, 36 F. Supp. 2d at 466 ("Liu has produced no evidence that demonstrates that O'Malley knew the relationship was abusive or nonconsensual. In fact, Liu has not produced any other evidence that indicates what O'Malley knew about the relationship, other than his characterization of the relationship as 'turbulent' . . . .").

Plaintiffs argue, however, that Mr. John's email to Milanca's parents following her death (Dkt. No. 29-3, at 7) proves that Mr. John (and by imputation, the U.C. Regents) was aware of a domestic violence incident. This email stated, in relevant part that "Prior to this 5/7/12 email (below), [Milanca] called me about a domestic violence incident but then assured me that everything's ok after I returned her call." *Id*. They argue that because Mr. John was aware of a domestic violence incident, he necessarily was aware of sexual violence or sexual harassment cognizable under Title IX. Accordingly, the Court is confronted with the following question: Is actual notice of a single incident of domestic violence sufficient to impose liability under Title IX?

The Court concludes that under the facts alleged, it does not. The Court so holds for several reasons. First, it is not clear under what circumstances an act of domestic violence between peers on a university campus constitutes sex-based harassment proscribed by Title IX. To hold a university liable for peer-to-peer sexual harassment under Title IX, the university must have had actual knowledge of sex-based harassment. Title IX does not address all instances of student-on-student violence or harassment. Rather, Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. §

20

1681(a).  The Court "glean[s] from this language of the statute a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate *because of* one's sex or gender." *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011) (emphasis added); *see also Hoffman v. Saginaw Pub. Sch.*, 12-10354, 2012 WL 2450805 (E.D. Mich. June 27, 2012) ("The law is settled that a Title IX claim is only cognizable if there is evidence that the offender acted because of the victim's sex.").  While domestic violence can be motivated by the victim's sex, it can also be motivated by other reasons, such as personal animus or jealousy.  *See, e.g., Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679 (W.D. Ky. 2003) ("To be actionable [under Title IX], the offensive behavior must be based on sex, rather than personal animus or other reasons."); *Burwell v. Pekin Comm. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002) (same); *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165-66  (5th Cir. 2011) (affirming summary judgment against a Title IX plaintiff because there was "nothing in the record to suggest that [the perpetrator] was motivated by anything other than personal animus").

While courts have not addressed the circumstances under which domestic violence can trigger a Title IX violation, at least one university has noted the distinction between gender based domestic violence and other domestic violence.  For example, Gonzaga University recognizes that "Domestic Violence that is based on sex or gender is a violation of Title IX and is also a violation of Gonzaga's sexual misconduct policy.  Domestic abuse or violence that is not based on sex or gender is still a violation of Gonzaga's Student Code of Conduct."  *See* Gonzaga Univ., "Stalking, Domestic Violence, and Sexual Assault," http://www.gonzaga.edu/Student-Life/Support-for-Students/Sexual-Misconduct/stalking-domesticviolence-sexualassault.asp (last visited Nov. 21, 2013).

Nonetheless, Plaintiffs rely on the "Dear Colleague Letter" on Sexual Violence published by the U.S. Department of Education's Office of Civil Rights.[10]  This letter states that "sexual violence" in the form of sexual assaults or rapes can constitute sexual harassment for purposes of Title IX.  *Id.* at 1 ("[T]his letter explains that the requirements of Title IX pertaining to sexual harassment also

---

[10] *See* Office for Civil Rights, U.S. Dep't of Educ., "Dear Colleague Letter: Sexual Violence," http://www.whitehouse.gov/sites/default/files/dear_colleague_sexual_violence.pdf (last visited Nov. 21, 2013).

cover sexual violence . . . .").  This letter is consistent with those cases which have recognized that deliberate indifference to  rape and sexual assault violates Title IX.  *See, e.g.*, *Soper v. Hoben*, 195 F.3d 845, 854-55 (6th Cir. 1999) ("[T]here is evidence in the record to support the Sopers' assertion that Renee was raped and sexually abused and harassed.  This obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive Renee of access to the educational opportunities provided by her school."); *see also Moore v. Murray State Univ.*, 5:12-CV-00178, 2013 WL 960320, at *4 (W.D. Ky. Mar. 12, 2013) ("[T]he type of sexual assault at issue here – an alleged rape – is the type so severe, pervasive, and objectively offensive that it could be said to deprive Moore of the educational opportunities and benefits provided by MSU."); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) ("There is no dispute that student-on-student sexual assault can constitute sexual harassment for Title IX purposes.").

However, it does not follow that because rape and sexual assault can result in a Title IX violation that *all* incidents of domestic violence do as well.  Given the inherently sexual nature of rape and sexual assault, it is reasonable to conclude from such incidents that the perpetrator was motivated, at least in part, by victim's sex.  *See Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 344 (W.D. Pa. 2011) ("Where an individual's interactions with another person are sexual in nature, it is reasonable to assume that those interactions are motivated, at least in part, by the other person's 'sex.'").  The Dear Colleague letter does not address domestic violence generally.[11]

Second, as noted above, the Complaint does not sufficiently allege what Mr. John or the University knew as a result of the single contact by Milanca with Mr. John.  Nor are there allegations suggesting that Mr. John was aware that the domestic violence incident in question was motivated because of Milanca's sex or that the alleged abuse from that incident had a sexual component.

---

[11] There are absolutely no allegations that Mr. John or the U.C. Regents were aware of the sexually abusive names to which Lumbreras subjected Milanca or the January 2012 sexual incident between Lumbreras and Milanca.

United States District Court

For the Northern District of California

1    For similar reasons, Plaintiffs have failed to allege that the U.C. Regents were deliberately

2    indifferent for purposes of Title IX.  When the Supreme Court adopted the deliberate indifference

3    standard in cases seeking damages for sexual harassment, it stated:

> We think, moreover, that the response must amount to deliberate
> indifference to discrimination.  [Title IX's] administrative enforcement
> scheme presupposes that an official who is advised of a Title IX
> refuses to take action to bring the recipient into compliance.  The
> premise, in other words, is an official decision by the recipient not to
> remedy the violation.  The framework finds a rough parallel in the
> standard of deliberate indifference.

8    *Gebser*, 524 U.S. at 290.  A federal funding recipient may "be liable for damages only where the

9    [recipient] acted in *clear violation of Title IX* by remaining deliberate indifferent to acts . . . of which

10   it had actual knowledge."  *Davis*, 526 U.S. at 642 (emphasis added).  As discussed, Plaintiffs'

11   Complaint, as currently plead, does not adequately allege that the U.C. Regents had knowledge of an

12   incident of abuse or harassment motivated by Milanca's sex.  Given the inadequacy of Plaintiff's

13   factual allegations, the Court concludes that the Complaint fails to allege was "deliberately

14   indifferent" to sex-based discrimination such that they acted in "clear violation of Title IX."

15           c.       Plaintiffs Have Failed to Allege that any "Deliberate Indifference" Caused

16                    Her to Be Subjected to Further Harassment

17   Even if Plaintiffs had adequately alleged actual knowledge or deliberate indifference on the

18   part of the U.C. Regents, they failed to allege that this deliberate indifference caused Milanca being

19   subjected to further discrimination or deprivation of Title IX rights.  In *Davis*, the Supreme Court

20   stated that a federal funding recipient may only be held liable for damages where its "deliberate

21   indifference 'subject[s]' is students to harassment.  That is, the deliberate indifference must, at a

22   minimum, 'cause [students] to undergo]' harassment or 'make them liable or vulnerable' to it."

23   *Davis*, 526 U.S. at 644-45 (quoting Random House Dictionary of the English Language 1415

24   (1966)).  Courts have construed this language as requiring Title IX plaintiffs to demonstrate that a

25   federal funding recipient's deliberate indifference caused them to be subjected to further

26   discrimination or deprivation.  *See, e.g.*, *Williams*, 477 F.3d at 1296; *see also Doe v. Blackburn*

27   *College*, No. 06-3205, 2012 WL 640046, (C.D. Cal. Feb. 27, 2012) ("Title IX liability generally

28   flows from two periods of harassment: (a) when a school exhibits deliberate indifference before a

23

United States District Court

For the Northern District of California

1  harassing attack in a way that makes the student more vulnerable to the attack itself; or (b) when the

2  school exhibits deliberate indifference after the attack which causes the student to endure additional

3  harassment.").

4        Beyond the conclusory allegation that "Defendant Lumbreras harassed Milanca Lopez based

5  upon her sex and Mexican-American race and ethnicity" from "August 2011 to May 18, 2012," FAC

6  ¶ 49-50, Plaintiffs do not allege any incidents of harassment which occurred *after* the U.C. Regents

7  allegedly obtained actual knowledge of the late April domestic violence incident.  The only

8  subsequent incident that is alleged is the fatal car accident which tragically took Milanca's and

9  Xavier's life on May 18, 2012.  *Id.* ¶ 41.  However, as stated above, the Plaintiffs have not alleged

10  that Lumbreras' decision to drive intoxicated (or any other aspect of the fatal accident) was

11  motivated by Milanca's gender or was part of a continuing source of harassment.  There is no

12  allegation, for instance, that Lumbreras forced Milanca into the car as part of the sex-based domestic

13  abuse.

14        Accordingly, Plaintiffs fail to allege sufficient facts to demonstrate deliberate indifference on

15  the part of the U.C. Regents to know a sex-based harassment or that any such deliberate indifference

16  *caused* Milanca to be subject to further harassment or deprivation of rights.  Plaintiffs have thus

17  failed to state a claim under Title IX.

18        4.    Conclusion

19        Accordingly, Plaintiffs Title IX claim is **DISMISSED** with prejudice as to Mr. John and

20  with leave to amend as to the U.C. Regents.  In their second amended complaint, Plaintiffs must

21  allege sufficient facts demonstrating: (1) that Lumbreras engaged in harassment or abuse that was

22  gender-based within the purview of Title IX; (2) that this harassment or abuse deprived Milanca of

23  educational benefits; (3) that the U.C. Regents had actual knowledge of (and were deliberately

24  indifferent) to incidents of harassment or abuse motivated by gender; and (4) that the deliberate

25  indifference caused Milanca to be subjected to further harassment or deprivation of rights.[12]

26  _____

27        [12] Additionally, because Title VI claims are held to the same standard as Title IX claims, the
   Court will **DISMISS** that claim with leave to amend to the same extent, and for the same reasons, as
28  Plaintiff's Title IX claims.  *See Stanley v. Trustees of California State University*, 433 F.3d 1129,
   1134 (9th Cir. 2006) ("The Supreme Court has repeatedly held that Title IX is based on Title VI and

United States District Court

For the Northern District of California

C.      Plaintiffs' State Law Claims

Because the Court has dismissed, with leave to amend, Plaintiffs' two federal law claims, it declines at this time to address Defendants' motion to dismiss arguments as to Plaintiffs' state law claims.  To the extent that Plaintiffs are unable to sufficiently allege a violation of Title IX or Title VI, the Court is not inclined to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.  *See, e.g.*, *S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1036 (9th Cir. 2009) ("Because the district court appropriately dismissed all of the federal claims, it acted within its discretion in declining to resolve the state law claims under its supplemental jurisdiction.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings is **GRANTED** as to Plaintiffs' federal causes of action, with leave to amend.  Plaintiffs' second amended complaint shall be filed within 30 days of this order.

This order disposes of Docket Nos. 27 and 30.


IT IS SO ORDERED.


Dated:  December 10, 2013

_____
EDWARD M. CHEN
United States District Judge

_____

has used similar modes of analysis to resolve Title IX cases."); *see also Bryant v. Independent Sch. Dist. No. I-38 of Garvin County*, 334 F.3d 928, 934 (10th Cir. 2003) (instructing the district court on remand to apply the Supreme Court's Title IX "deliberate indifference" test to plaintiff's Title VI claim); *Manolov v. Borough of Manhattan Community College*, No. 12 Civ. 1919(GBD)(FM), 2012 WL 6703570, at *5 (S.D.N.Y. Dec. 20, 2012) ("Title VI and Title IX operate in the same manner, except that Title VI prohibits race discrimination in all programs receiving federal funds, whereas Title IX prohibits sex discrimination in education programs.").